# NO. 12-19-00167-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *BRENT SINGLETON,*<br>*APPELLANT* | § | *APPEAL FROM THE 411TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *TRINITY COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Brent Wade Singleton appeals his conviction for aggravated assault of a police officer by use or exhibition of a deadly weapon. Appellant presents seven issues on appeal. We affirm.

## BACKGROUND

In February 2016, Appellant was with his friend, Ronald Kizzee, at a McDonald's drive thru. The two men were in Appellant's vehicle and noticed a Trinity police officer watching them. After receiving their order, the men pulled into the connecting convenience store. At that time, Officer Jeff Dean pulled his police car behind their vehicle and asked to speak with Kizzee about an ongoing investigation. During his conversation with Kizzee, Officer Dean noticed a rifle in the vehicle and asked to whom it belonged. Kizzee responded that it was Appellant's rifle. Officer Dean believed Appellant to be a felon and was concerned he had committed the offense of unlawful possession of a firearm by a felon. Officer Dean proceeded to investigate and questioned Appellant. Appellant was uncooperative, refused a frisk, and refused to wear hand restraints. Ultimately, Appellant fled the scene. Officer Dean allowed Kizzee to leave in Appellant's vehicle.

Officer Dean sought assistance from Deputy Jeremy Alexander with the Trinity County Sheriff's Office in locating Appellant after he fled. The officers learned that Appellant was at

Kizzee's residence. Upon his arrival at the residence, Officer Dean observed Appellant's truck and noticed that the firearm had been removed. Deputy Alexander and Officer Dean received permission from Kizzee to search the residence for Appellant. Deputy Alexander saw Appellant with a firearm inside the house, so the officers returned outside. Officer Dean saw someone he believed to be Appellant exit the back of the residence holding a firearm. Appellant raised the rifle in the officers' direction. Officer Dean yelled for Appellant to put the gun down. When Appellant failed to comply, the officers fired at Appellant. Appellant then ran around the house and was not seen again that day.

Appellant was later arrested and charged by indictment with aggravated assault of a police officer by use or exhibition of a deadly weapon. Appellant pleaded "not guilty" and the matter proceeded to a jury trial. The jury found Appellant "guilty" and sentenced him to thirty-five years imprisonment. Appellant filed a motion for new trial, which was denied. This appeal followed.

### ADMISSION OF EVIDENCE

In his first and second issues, Appellant contends the trial court abused its discretion when it admitted two pieces of evidence. In his first issue, Appellant urges the trial court erred in admitting hearsay. And in his second issue, Appellant posits that the trial court erroneously admitted evidence that was not based on personal knowledge.

### Standard of Review

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.–Tyler 2011, pet. ref'd). If the ruling is within the zone of reasonable disagreement, an appellate court will not disturb it. *Manuel*, 357 S.W.3d at 74.

### Hearsay

In his first issue, Appellant contends the trial court erred in admitting the audio recording of a statement made by Kizzee to Deputy Tommy Park. Appellant contends the evidence, which was admitted as a prior consistent statement under Texas Rule of Evidence 801(e)(1)(B), constituted inadmissible hearsay.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d).

2

"Hearsay is not admissible except as provided by statute or [the Rules of Evidence] or by other rules prescribed pursuant to statutory authority." TEX. R. EVID. 802. A declarant witness's prior statement is not hearsay when the declarant testified and is subject to cross-examination about a prior statement and the statement is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying. TEX. R. EVID. 801(e)(1)(B). Prior consistent statements are admissible when four foundational requirements are met: (1) the declarant must testify at trial and be subject to cross-examination; (2) the opposing party must have made an express or implied charge of recent fabrication or improper influence or motive regarding the declarant's testimony; (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose. *Trejo v. State*, 594 S.W.3d 790, 802–03 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

This rule sets forth a minimal foundation requirement of an implied or express charge of fabrication or improper motive. *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007). In any event, "there need be only a suggestion that the witness consciously altered his testimony in order to permit the use of earlier statements that are generally consistent with the testimony at trial." *Id.* (citation omitted). The fact that "there need be only a suggestion" of conscious alteration or fabrication gives the trial court substantial discretion to admit prior consistent statements under the rule. *Id.* Thus, the court of criminal appeals has noted

> that a reviewing court, in assessing whether the cross-examination of a witness makes an implied charge of recent fabrication or improper motive, should focus on the "purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court." Courts may also consider clues from the voir dire, opening statements, and closing arguments. From the totality of the questioning, giving deference to the trial judge's assessment of tone, tenor, and demeanor, could a reasonable trial judge conclude that the cross-examiner is mounting a charge of recent fabrication or improper motive? If so, the trial judge does not abuse his discretion in admitting a prior consistent statement that was made before any such motive to fabricate arose.

*Id.* at 808–09 (internal citations omitted).

Appellant argues that there was no allegation that Kizzee fabricated any testimony or acted from a recent improper motive or influence. We disagree.

On cross-examination, Appellant's counsel questioned Kizzee as follows:

Q. Your story then was a lot different than it is now, right?
A. What was my story?
Q. We'll get to that in one second, okay?

. . .

Q. And the State actually said, even though you have this pending felony, we'll let you get out of jail for free?
A. When did they say that?
Q. Okay. Well, did you get out of jail last year?
A. Last year, yeah, but in October or November.
Q. Okay.
A. Or September.
Q. Okay. Did you have to pay any money to get out?
A. No.
Q. Okay. So the DA said, "You can get out of my jail for free," right?
A. No, the DA didn't tell me that. I didn't see no judge. I didn't see a lawyer either.
Q. Yeah, they just let you out.

. . .

Q. Now, Mr. Kizzee, you testified yesterday that Brent was in the house, correct?
A. Right.

. . .

Q. All right. I asked you, "Was Brent in the house," correct?
A. Right.
Q. You stated, "No," correct?
A. Yes.
Q. You never put a caveat on it, if he was there before, during, or after a shooting, correct?
A. Right.
Q. You just said, "No, Brent was never in my house," correct?
A. No.

. . .

A. You cut me off that day. You didn't want to hear the part about him being in my house. I didn't even tell you that part.
Q. Okay. But we'll get to that in a second, all right?
A. Okay.
Q. What you told me that day was he was not in the house, correct?

. . .

Q. Okay. Do you remember telling me that the DA keeps harassing you?
A. No, the DA hasn't been harassing me.
Q. Do you remember that you said you've been in jail for five months until they got you out and brought you to the DA's office to talk about this?
A. They didn't talk about the -- about the case.
Q. Okay. So they just brought you to the DA's office out of the jail just to talk to you, say --
A. When I got out, I came to court. I come to court, and they dismissed the case that I was in jail on.
Q. Oh, the district attorney dismissed the case?

4

A. No, they kicked it out right here. Ms. -- Ms. -- Ms. -- I can't think of her name.
Q. Okay. So you got a case dismissed?
A. Right.
Q. How long were you in jail for on that case?
A. I don't remember that. I don't remember.
Q. And now you have two pending felonies, don't you?
A. The felonies that you're talking about I haven't went to court on.
Q. Until after this case is done, correct?
A. I don't know when it's going to do it.
Q. So have you given me, my investigator, the DA's office -- and when I say "the DA's office," I'm talking about Mr. Schiro or any part of his team, including his investigator -- a different version of what you're telling us, the two stories today?
A. That's the way it seems.

. . .

Q. All right. Mr. Kizzee, do you remember telling me that, "The DA" -- and I quote – "wants me to lie for them"?
A. No, I don't remember telling you that.

. . .

Q. And Mr. Kizzee, your story yesterday and today is vastly different than when I spoke with you, correct?
A. You confused me then.

On redirect, the State clarified that, contrary to Appellant's assertion, the State never asked Kizzee to lie under oath. In fact, Kizzee testified that the State simply asked him to tell the truth. The State offered an audio recording of an interview between Kizzee and Deputy Park. Appellant objected and the trial court overruled the objection. The trial court stated, "I think that, through your cross-examination, you did assert that there was an improper influence based on the fact that he was released and then in and then – and then – I do think – I do think that 801 probably applies."

Appellant's cross-examination of Kizzee implied that Kizzee recently fabricated his statements. He accused Kizzee of having an undisclosed "deal" with the State regarding the disposition of his own pending cases or hoping for leniency in exchange for his testimony. In addition, he explicitly accused the State of asking Kizzee to lie under oath. As a result, the trial court did not abuse its discretion in admitting the prior consistent statement. *See* TEX. R. EVID. 801(e)(1)(B); *see also* **Hammons**, 239 S.W.3d at 808-09. We overrule Appellant's first issue.[1]

---

[1] To the extent Appellant argues that Kizzee's statements attributable to Appellant are hearsay within hearsay, we decline to address these arguments. Appellant did not raise this objection at trial, and, furthermore, statements made by Appellant are not hearsay under the admission of a party opponent exclusion to the hearsay rule. *See* TEX. R. APP. P. 33.1; *see also* TEX. R. EVID. 801(e)(2).

**Personal Knowledge**

In his second issue, Appellant urges the trial court abused its discretion in admitting Kizzee's recorded interview because the recording contained Kizzee's opinions about Appellant and that those opinions were expressed without personal knowledge.

Texas Rule of Evidence 602 provides as follows:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

TEX. R. EVID. 602. Opinion testimony by a lay witness is limited to those rationally based on the witness's perception and considered helpful to clearly understanding the witness's testimony or to determining a fact issue. TEX. R. EVID. 701.

Without pointing to specific statements or testimony, Appellant claims the trial court erred in admitting Kizzee's recorded statement that included Kizzee's opinions on Appellant's actions. He claims the recording introduced Kizzee's opinions about whether Appellant would use a gun, about Appellant's mental health, and what Appellant might do in the future in regard to the police officers. Appellant contends Kizzee did not have personal knowledge of those matters, and, therefore, the testimony was inadmissible opinion testimony.

The majority of Kizzee's recorded interview concerns the events preceding Appellant's arrest. During the interview, Kizzee told Deputy Park that Appellant "hated" the officers involved "with a passion." When Deputy Park asked, Kizzee explained that Appellant told him those officers "were gonna get it" and that he did not like them. On direct examination, Kizzee clarified that Appellant said "something about his son getting killed" as the basis for his dislike of the officers. He also told Deputy Park that he had known Appellant for approximately two years, Appellant is a former Marine, he believes Appellant would use a gun "if he had to," and Appellant is "wild." Kizzee further explained that he believes Appellant is "shell shocked" and "not all the way there."

It is apparent that Kizzee's opinions about Appellant's actions and beliefs are based on his personal experience and knowledge of Appellant. Kizzee stated that he has known Appellant for two years. Furthermore, Kizzee told Deputy Park what Appellant said that formed the basis

6

of Kizzee's opinions. Kizzee's own testimony is sufficient to prove personal knowledge. *See* TEX. R. EVID. 602. As a result, the trial court did not abuse its discretion in admitting this portion of the recorded statement. *See* TEX. R. EVID. 602, 701. We overrule Appellant's second issue.

<u>MOTION TO SUPPRESS</u>

In his third issue, Appellant contends the trial court erred in failing to issue findings of fact and conclusions of law regarding the denial of his motion to suppress. We previously remanded the case for the trial court to enter findings of fact and conclusions of law, and the trial court complied. As a result, we no longer need to address this issue. *See* TEX. R. APP. P. 47.1. In his fourth issue, Appellant urges the trial court erred in overruling his motion to suppress because he was unlawfully detained.

**Standard of Review**

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). A trial court's decision to grant or deny a motion to suppress is generally reviewed under an abuse of discretion standard. *Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010); *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Neal v. State*, 256 S.W.3d 264, 281 (Tex. Crim. App. 2008). At a suppression hearing, a trial court is the exclusive trier of fact and judge of the witnesses' credibility. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). Accordingly, a trial court may choose to believe or to disbelieve all or any part of a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). However, a trial court has no discretion in determining what the law is or applying the law to the facts. *State v. Kurtz*, 152 S.W.3d 72, 81 (Tex. Crim. App. 2004). Thus, a failure by a trial court to analyze or apply the law correctly constitutes an abuse of discretion. *Id.*

**Applicable Law**

There are three distinct types of interactions between a police officer and a citizen: (1) encounters, (2) investigative detentions, and (3) arrests. *State v. Perez*, 85 S.W.3d 817, 819

(Tex. Crim. App. 2002). In an encounter, an officer may ask the citizen if he is willing to answer questions or pose questions to him if he is willing to listen. *Id*. During an encounter, the citizen can terminate the interaction with the officer and walk away at any time. *Munera v. State*, 965 S.W.2d 523, 527 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd). Consensual encounters do not trigger Fourth Amendment protection if a reasonable person would feel free to disregard the officer and end the encounter at his own will and at any time. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386, 115 L. Ed. 2d 389 (1991). Regardless of whether there has been any wrongdoing, in an encounter, officers may ask the individual general questions or ask to see and examine the individual's identification, so long as the officer does not indicate that compliance is required. *Id*. at 434–35, 111 S. Ct. at 2386.

By comparison, during an investigative detention, an officer is authorized to temporarily detain an individual for investigative purposes when the officer has reasonable suspicion that the individual could be involved in some type of criminal activity. *See Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002). Investigative detentions are justified when, after considering the totality of the circumstances, the detaining officer has specific articulable facts which, when taken together with rational inferences from those facts, lead to a reasonable suspicion that the person detained actually is, has been, or soon will be engaged in criminal activity. *Id*. The controlling question is whether the actions of the officer would have made a reasonable person feel that he was not free to decline the officer's request or otherwise terminate the encounter. *State v. Velasquez*, 994 S.W.2d 676, 679 (Tex. Crim. App. 1999). Consensual encounters can become investigative detentions if the officer conveys an indication that compliance is mandatory. *Id*. The existence of reasonable suspicion turns on an objective assessment of the detaining officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's state of mind. *See United States v. Knights*, 534 U.S. 112, 122, 122 S. Ct. 587, 593, 151 L. Ed. 2d 497 (2001); *Griffin v. State*, 215 S.W.3d 403, 409 (Tex. Crim. App. 2006). Absent reasonable suspicion, an investigative detention violates the Fourth Amendment. *See Francis v. State*, 922 S.W.2d 176, 178 (Tex. Crim. App. 1996).

The final level of interaction, an arrest, is also a seizure. *Id*. An arrest must be accompanied by probable cause to believe that a person has engaged in or is engaging in criminal activity. *Id*. This level of suspicion is meant to protect law abiding citizens from the high level

of intrusion that accompanies an arrest.  *Id.*  Unlike an investigative detention, where the seizure may end within a brief period of time, the seizure involved in an arrest will not be brief.  *Id.*

**Analysis**

Appellant argues that his initial detention by Officer Dean was unlawful and that, as a result, all of the evidence flowing from that detention was inadmissible.  He further argues that the trial court erred in denying his motion to suppress and finding that he was not unlawfully detained.

Prior to trial, Appellant filed motions to suppress.  In one motion, Appellant argued that his Fourth, Fifth, Sixth, and Fourteenth Amendment rights had been violated as well as his rights under the Texas Constitution in several respects.  Appellant's allegations included an argument that the initial stop at the convenience store parking lot was an unlawful detention among other alleged Constitutional violations.  The trial court held a hearing on Appellant's motions and verbally denied them.  Following remand from this Court, the trial court entered findings of fact and conclusions of law regarding the denial of the motions to suppress.  On appeal, Appellant only challenges the denial regarding the initial stop at the convenience store.

The trial court made the following pertinent findings of fact:

1) On February 17, 2016, Officer Jeff Dean was working for the Trinity Police Department and spotted an individual, Andre Kizzee, whom he was investigating on an unrelated matter at a combined McDonolds [sic] restaurant and convince [sic] store.

2) Kizzie was the passenger in a vehicle being operated by the Defendant, Brent Singleton.

3) Officer Dean watched as Kizzee and Singleton went through the restaurant and then the convince [sic] store.

4) As Singleton and Kizzie exited the store, Dean pulled his vehicle around to the area of Singleton's vehicle in an effort to make contact with Kizzee.

5) Dean's police vehicle was not in a position to prevent Singleton's vehicle leaving the scene, should Singleton have desired to leave.

6) Dean made contact with Singleton who assisted Dean in speaking to Kizzie.

7) Dean did not stop Singleton's vehicle, did not use his police lights, sirens, block Singleton's vehicle with his police vehicle, make any commands, or use any show of authority to detain Singleton or Kizzie at this time.

8) Singleton nor Kizzee expressed any desire to leave the encounter with Dean at that point.

9) Dean was speaking with Kizzie who was seated in the passenger side of the truck while the door was open.

10) Dean noticed a rifle in the front seat of the truck and asked Kizzee who the rifle belonged to.

11) Kizzee in response to the questioning told Dean that the rifle belonged to Singleton.

12) Dean credibly testified that through his experience he knew Singleton was a suspect in two prior felonies. One being a case of possession of methamphetamine in which Dean was personally involved and the other being a prior shooting alleged to have been committed by Singleton.

13) Dean credibly testified that at the time he found out the rifle belonged to Singleton, he did not know if Singleton had been adjudicated guilty [of] those two felonies and wanted to determine if he had been found guilty.

14) Dean then testified that his focus then turned from the matter with Kizzie to whether or not Singleton was committing the offense of "felon in possession of a firearm".

15) Dean began his investigation by taking the firearm.

16) Dean next went to Singleton in an effort to detain Singleton while continuing his investigation due to the possible danger Singleton posed.

17) Dean testified credibly that he was in fear for his safety.

18) Dean testified credibly that he believed Singleton could be a danger due [to] what may be contained on his person and wanted to conduct a pat down search for safety.

19) Singleton would not allow Dean to conduct a pat down search for his safety.

20) Due to Singleton's lack of cooperation to the pat down, Dean attempted to place him in hand restraints.

21) Singleton would not submit to hand restraints

22) Dean produced a taser and asked Singleton to comply to hand restraints on several occasions.

23) Singleton continued to refuse all commands by Dean to detain him and eventually fled the scene on foot.

Officer Dean's body camera footage was also admitted into evidence for the trial court's consideration. Based on this evidence, the trial court made the following findings:

37) …

1. The video begins with Dean talking to Singleton regarding Kizzee. At this point, Dean is in his patrol vehicle and Singleton is standing in close proximity to the driver's door of Dean's vehicle having a conversation with Dean. Singleton's truck can be seen on the body camera and is not being blocked in by Dean's vehicle. Singleton has no vehicles on either side of his vehicle, Singleton has room to back his truck out of its parking spot and leave.

2. Dean asks if he can speak to Kizzee who is located in the passenger seat of Singleton's truck.

10

3. Singleton approaches the passenger side of his truck while Dean stays in his police vehicle, Singleton appears to discuss something with Kizzee and asks Dean if he is going to arrest Kizzee, Dean replies that he is not.

4. Dean then exits his vehicle leaving it where it was and walks towards Singleton's truck. Upon approaching Singleton's truck, Dean and Singleton have a brief discussion at the rear area of the truck where Singleton tells Dean "OK" and indicates by pointing towards the passenger side of his truck. Dean then says to Singleton "Do you mind?" and Singleton replies "No".

5. Dean next begins speaking with Kizzee at the passenger door of Singleton's truck regarding the unrelated matter. This discussion begins at approximately 1:40 seconds into the video and lasts approximately 6 minutes.

6. During the discussion between Singleton and Kizzee, Singleton is not in his vehicle and not on camera most of the six minutes Dean and Kizzee are discussing the unrelated matter. At certain points during the conversation between Kizzee and Dean, Singleton can be seen doing the following:

1. Having a discussion with someone in Dean's vehicle multiple times[.]

2. Smoking a cigarette[.]

3. Making a cell phone call for Kizzee in relation to the unrelated investigation[.]

4. Turning the truck off so that Kizzee can carry on his phone conversation related to the unrelated investigation[.]

5. Singleton makes no attempts to end the encounter and leave.

7. Dean then notices the rifle and asks Singleton if it belongs to him. Singleton replies "yeah."

8, Dean begins questioning Singleton regarding whether or not he is a felon and asks about previous encounters with Singleton wherein he believed that Singleton had been arrested for being a felon in possession of a firearm.

9. When Singleton denies he had a prior charge for felon in possession, Dean then asks for his name. Singleton refuses to give his name, telling Dean "you know my name[.]" Dean then says "your real name." Singleton persists in refusing to give his name to Dean.

10. At this point in the video, Singleton's demeanor changes. Singleton's voice changes to a low whisper. He begins trying to arrest Dean and putting himself in close proximity to Dean. Dean warned Singleton to back up due to Singleton's close proximity. Dean then commands Singleton to turn around to which Singleton refuses.

11. Singleton begins backing up from Dean. Dean continues to attempt to get Singleton to comply with his command to submit to hand restraints. Dean threatens to tase Singleton but never deploys his taser. Dean follows Singleton around the parking lot in an attempt to detain Singleton and continue his investigation into Singleton being a possible felon.

12. Singleton never complies with any of the requests to submit to hand restraints or any other show of authority from Officer Dean.

13. Singleton then flees the scene on foot and Officer Dean does not follow.

11

14. After Singleton flees Dean walks in the direction that he fled to. It can be seen when Dean is walking back to his vehicle that his vehicle is not directly behind Singleton's vehicle. Dean's vehicle is approximately 15 feet behind Singleton's vehicle; and in no way blocked in by Dean's vehicle.

15. At no time did Dean use any police lights or sirens or any other show of authority to effect a stop of Singleton.

16. Dean never drew a weapon or had any show of authority towards Singleton until his investigation shifted from the unrelated Kizzee matter to whether was committing the offense of Unlawful Possession of a Firearm.

17. Well after Singleton flees the scene, Dean can be heard on video asking for dispatch to run a criminal history of Singleton and gives the reason that he wants to find out if he is a convicted felon, which corroborates Dean's testimony regarding his reasoning for wanting to detain Singleton.

In its conclusions of law, the trial court determined that Dean did not violate Appellant's Fourth Amendment rights. The court made the following conclusions:

4) Considering all the circumstances during the initial encounter between Dean and Singleton, including the distance and positioning of the vehicles which did not prevent Singleton from leaving, Singleton initially speaking with Dean while Dean was inside his vehicle, Singleton's assistance in facilitating a conversation between Dean and Kizzee, Singleton's actions of engaging in casual conversation during the interaction between Dean and Kizzee, Singleton's assistance to Kizzee in making a phone call during the unrelated investigation into Kizzee, Singleton turning off his truck so that Kizzee could carry on a phone conversation during the investigation, and Singleton expressly agreeing to allow Dean to speak with Kizzee by actions and words. *See findings of fact* 37 (4) and Exhibit 1, I conclude that initially the encounter between Dean, Singleton and Kizzee was not a seizure in violation of the U.S and Texas Constitutions, but a consensual encounter.

. . .

8) Dean attempted to change the consensual encounter discussed in section 4 above into an investigative detention when he began asking Singleton to place his hands behind his back.

9) Because Singleton refused to comply with the initial command and subsequent similar commands, I find that no seizure occurred. Because no seizure occurred, Dean's actions did not violate either the U.S. or Texas constitutions during his interaction with Singleton.

10) I further find that due to Dean's knowledge of prior felony arrests of Singleton and Singleton's admission that the firearm found in his vehicle belonged to him, Dean had reasonable suspicion that Singleton may have been committing the crime of Unlawful Possession of a firearm and could have legally detained Singleton had Singleton complied with Dean's commands.

. . .

13) I find that Dean was attempting to lawfully detain Singleton to investigate the possible offense of Unlawful possession of a firearm when he asked Singleton to place his hands behind his back. I

12

further find that Singleton committed the offenses evading arrest or detention when he fled from the scene at the McDonalds/convince [sic] store.

14) I further find that Dean and Alexander had authority to arrest Singleton for the offense of Evading Arrest and Detention due to the offense taking place in the presence of Officer Dean earlier that night as well as Dean conveying the facts [] of the offense to Alexander.

At the suppression hearing, Appellant argued that a reasonable person would not have believed that he had the right to leave because Appellant's car could not leave and the officer asked to speak with someone in the vehicle. However, Officer Dean was entitled to approach Singleton and Kizzee to engage in a casual encounter. *See **Crain***, 315 S.W.3d at 49. Furthermore, the trial court found that Officer Dean's vehicle did not prevent Appellant's vehicle from leaving. Thus, we conclude that Dean's initial decision to approach the vehicle and speak with Kizzee and Appellant was not a seizure triggering Fourth Amendment protection. *See **id.***; ***Glaspie v. State***, No. 12-18-00230-CR, 2019 WL 3024766, at *2 (Tex. App.—Tyler July 10, 2019, pet. ref'd) (mem. op., not designated for publication). Because the trial court did not abuse its discretion by concluding that Appellant was not unlawfully seized, we overrule Appellant's fourth issue.

## ADMISSION OF INCRIMINATING STATEMENTS

In his fifth and sixth issues, Appellant contends the trial court erred in admitting statements that were obtained in violation of *Miranda* and Article 38.22 of the Texas Code of Criminal Procedure.

### Standard of Review and Applicable Law

Review of a trial court's ruling on a ***Miranda***-violation claim requires an appellate court to conduct a bifurcated review. ***Alford v. State***, 358 S.W.3d 647, 652-53 (Tex. Crim. App. 2012) (citing ***Ripkowski v. State***, 61 S.W.3d 378, 381-82 (Tex. Crim. App. 2001)). Whether custodial questioning constitutes "interrogation" under ***Miranda*** is a mixed question of law and fact, and we defer to the trial court's fact findings that turn on an evaluation of credibility and demeanor. *Id*. "If credibility and demeanor are not necessary to the resolution of an issue, whether a set of historical facts constitutes custodial interrogation under the Fifth Amendment is subject to *de novo* review because that is an issue of law: it requires application of legal principles to a specific set of facts." *Id*.

In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Alford*, 358 S.W.3d at 653 (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966)). The *Miranda* rule generally prohibits the admission into evidence of statements made in response to custodial interrogation when the suspect has not been advised of certain warnings (including that the suspect has a right to remain silent and a right to counsel). *Miranda*, 384 U.S. at 466-71, 86 S. Ct. 1602, 1623-26. In the *Miranda* context, "interrogation" means "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 1689-90, 64 L. Ed. 2d 297 (1980). This "should know" test is the general test for determining whether interrogation occurs. *Alford*, 358 S.W.3d at 661. This test focuses primarily upon the perceptions of the suspect, rather than the intent of the police. *Innis*, 446 U.S. at 301, 100 S. Ct. 1682, 1690.

But the Supreme Court explicitly carved out an exception to the general test for matters "normally attendant to arrest and custody." *Id.* at 300-01, 100 S. Ct. 1682, 1689-90. Routine booking questions are normally attendant to arrest and custody, and recognition of this fact has given rise to what has been called the "routine booking question exception" to the *Miranda* rule. *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 2650, 110 L. Ed. 2d 528 (1990). Although termed a "booking" exception, this exception appears to be somewhat broader than booking and encompasses routine administrative processing associated with arrest or custody. *See Muniz*, 496 U.S. at 601, 110 S. Ct. 2638, 2650 (referring to questions "necessary to complete booking or pretrial services"). The point of the exception is that questions that fall within the exception "serve a legitimate administrative need." *Alford*, 358 S.W.3d at 654.

The types of questions that are allowed under this exception are generally requests for biographical data, such as "name, address, height, weight, eye color, date of birth, and current age." *Muniz*, 496 U.S. at 601, 110 S. Ct. 2638, 2650; *Alford*, 358 S.W.3d at 654. To determine whether a particular question falls within the booking exception, we ask "whether the question reasonably relates to a legitimate administrative concern, applying an objective standard." *Alford*, 358 S.W.3d at 659-60.

14

Under Article 38.22, no oral statement of an accused made as a result of custodial interrogation shall be admissible against an accused in a criminal proceeding unless (1) the statement was recorded, and (2) prior to the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. TEX. CODE CRIM. PROC. ANN. art. 38.22 § 3(a) (West 2018); *Joseph v. State*, 309 S.W.3d 20, 23–24 (Tex. Crim. App. 2010). The warnings required by Article 38.22 include those stated in *Miranda*, as well as a warning that the accused "has the right to terminate the interview at any time." TEX. CODE CRIM. PROC. ANN. art. 38.22 §§ 2(a), 3(a)(2); *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). Like *Miranda*, routine booking questions do not equate to custodial interrogation as contemplated by Article 38.22. *See Jones v. State*, 795 S.W.2d 171, 176 (Tex. Crim. App. 1990).

**Analysis**

Following the events at Kizzee's residence, the State issued a warrant for Appellant's arrest for the offense of aggravated assault on a police officer. "A couple of months" later, Officer Randy Wheeler of the Trinity Police Department learned that Appellant was at a house in Trinity and gathered a team of officers to search the residence. When the officers arrived, they found Appellant in a shed in the backyard and arrested him. Officer Wheeler testified that he asked Appellant if he had any narcotics or weapons on his person before transporting him to jail. Officer Wheeler explained that he routinely asks those questions for safety reasons. Officer Wheeler's bodycam footage of the arrest was admitted into evidence and played for the jury as well. Appellant contends these questions were given before Appellant received *Miranda* or Article 38.22 warnings, and, therefore, were impermissible and his responses were inadmissible.

Contrary to Appellant's assertion, police practices "seek[ing] only physical evidence, not testimonial confessions of guilt" are excluded from the scope of incriminating responses. *Jones*, 795 S.W.2d at 175. "[R]outine inquiries, questions incident to booking, broad general questions such as 'what happened' on arrival at the scene of a crime, and questions mandated by public safety concerns are not interrogation." *State v. Ortiz*, 346 S.W.3d 127, 134–35 (Tex. App.—Amarillo 2011), *aff'd*, 382 S.W.3d 367 (Tex. Crim. App. 2012) (citing *Jones*, 795 S.W.2d at 174 n.3).

Officer Wheeler explained that he asked Appellant if he had any narcotics or weapons on his person to ensure the safety of everyone involved. That included the officers, staff at the jail,

15

Appellant, and other inmates. Officer Wheeler further testified that Appellant answered his questions in a surprising way:

> He made two statements, once when I was asking if he had anything illegal on his person, like narcotics, he said, "No."
>
> I said, "Do you have any weapons," and he said, "No. I didn't have any that night either." And then as I – I'm already starting to -- fixing to pat him down as I'm asking this. I lean him up against the truck and just checking his person before I take him in. He says, "Say, Wheeler" -- something along them lines – "That's the second time Alexander done tried to chase me down."

Wheeler's questions were limited to routine questions and were not designed to elicit incriminating responses. *See **Ortiz***, 346 S.W.3d at 134 (the term "incriminating response" refers to a response that the prosecution may seek to introduce at trial). It is axiomatic that an arresting officer needs to be aware of whether a charged person is carrying weapons or other dangerous or illegal items. Wheeler's questions did not request testimonial confessions of guilt regarding the charged offense. *See **Martinez-Hernandez v. State***, 468 S.W.3d 748, 761 (Tex. App.—San Antonio 2015, no pet.). Appellant's decision to elaborate his responses beyond a simple "yes" or "no" were not contemplated by Wheeler's questions. As a result, we hold the trial court did not abuse its discretion in admitting the evidence. We overrule Appellant's fifth and sixth issues.[2]

## DISPOSITION

Having overruled Appellant's first, second, fourth, fifth, and sixth issues, we ***affirm*** the trial court's judgment.

**BRIAN HOYLE**
Justice

Opinion delivered September 9, 2020.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

---

[2] In his seventh issue, Appellant urges that the cumulative effect of the trial court's errors in admitting evidence resulted in harm and an unfair trial. Because we overrule Appellant's previous issues, we need not address this issue. *See* TEX. R. APP. P. 47.1; *see also* TEX. R. APP. P. 44.2.



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**SEPTEMBER 9, 2020**

**NO. 12-19-00167-CR**

**BRENT SINGLETON,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 411th District Court

of Trinity County, Texas (Tr.Ct.No. 10535)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*